UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
JOSEPH L CIOCIOLA,

                            Plaintiff,

            -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                          Defendant.
------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

12 Civ. 7626 (KMK) (PED)

TO THE HONORABLE KENNETH M. KARAS, United States District Judge:

# I. INTRODUCTION

Plaintiff Joseph Louis Ciociola brings this action pursuant to 42 U.S.C. § 405(g)

challenging the decision of the Commissioner of Social Security (the "Commissioner") denying

his application for benefits on the ground that he is not disabled within the meaning of the Social

Security Act (the "SSA"), 42 U.S.C. §§ 423 *et seq.* The matter is before me pursuant to an Order

of Reference entered June 5, 2013 (Dkt. #6). Presently before this Court are the parties' cross-

motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure (Dkt. #16 (plaintiff's motion), #19 (defendant's motion), #20 (defendant's

memorandum of law in support)). For the reasons set forth below, I respectfully recommend that

defendant's motion be **DENIED**, that plaintiff's motion be **GRANTED** and the case

**REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative

proceedings.

## II. BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration (Dkt. #5), filed by defendant in conjunction with the Answer (Dkt. #4).

A. Application History

Plaintiff was born on March 5, 1959.  R. 87.  On or about February 3, 2010, plaintiff (by and through counsel) applied for Supplemental Security Income disability benefits, alleging that he had been disabled since June 8, 2009 due to arthritis, bone disease, high blood pressure and problems with his back, knees, hands and right thumb.  R. 81, 87, 90, 174-84.  His claim was administratively denied on August 25, 2010.  R. 67-68, 95.  On September 13, 2010, plaintiff requested a hearing before an administrative law judge ("ALJ") and also submitted a request for reconsideration.  R. 99-100.  On January 12, 2011, following reconsideration, plaintiff's claim was administratively denied.  R. 69-70, 103.  On January 26, 2011, plaintiff again requested a hearing before an ALJ.  R. 105.  That hearing was held on May 11, 2011, before ALJ Regina Warren.  R. 34.  Plaintiff appeared with counsel; plaintiff and Vocational Expert Kristan Cicero testified at the hearing.  R. 38-65.  On May 19, 2011, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the SSA and, thus, was not entitled to disability benefits.  R. 17-26.  The ALJ's decision became the final order of the Commissioner on August 14, 2012, when the Appeals Council denied plaintiff's request for review.  R. 1.  Plaintiff timely filed this action on October 12, 2012.

B. Treating Sources

The administrative record contains treatment notes, radiology reports and lab results from Joseph Nestola, M.D., Nassau Orthopedic Surgeons, P.C., Performance Sports Medicine and Rehabilitation ("Performance Rehab"), New Island Hospital, Michael Capogna, D.C. and

Thomas Chambers, M.D. for treatment provided to plaintiff from June 11, 2009 to February 15, 2011.[1] The following is a distillation of their relevant points.

1. *Claimed Disabilities: Hypertension*

On October 1, 2009, plaintiff was examined by Dr. Joseph Nestola who noted that plaintiff was there for a blood pressure check. R. 338. Plaintiff reported his weight as 380 lbs; his blood pressure was 160/90. Id. Dr. Nestola continued plaintiff's prescription for Diovan[2] and noted that he was to return in six weeks for another blood pressure check. Id. Plaintiff returned on October 28, 2009, at which time his blood pressure was 130/75. Id.

On January 25, 2010, plaintiff returned to Dr. Nestola for routine blood pressure monitoring. R. 328, 331. Dr. Nestola continued plaintiff's antihypertensive medication (Diovan) at the same dose; his prescription included three refills. R. 329, 331. On April 22, 2010, Dr. Nestola renewed plaintiff's Diovan prescription. R. 414.

Plaintiff returned to Dr. Nestola on October 27, 2010 for a routine office visit. R. 411. Dr. Nestola noted that plaintiff had "[n]o complaints at present" although "[h]e did have a Gout

---

[1] The record also reflects that plaintiff was treated six times from January 2001 through May 2003 by two doctors from Nassau Orthopedic Surgeons for various complaints (left knee injury, right wrist pain, left thumb pain, stiffness and triggering, right wrist tendinitis and right ankle pain). R. 262-68, 270-71. These treatment records (which predate plaintiff's claimed onset date by more than six years) are not mentioned in the ALJ's decision (R. 17-26). Because neither party argues that the ALJ erred by failing to consider these treatment records, I will likewise disregard them. I have also disregarded all treatment records from Dr. Katime (R. 394-404) because they are irrelevant to plaintiff's claimed disabilities (and neither party suggests otherwise).

[2] Diovan is also known as Valsartan. See MedlinePlus, a service of the U.S. National Library of Medicine and the National Institutes of Health, available at http://www.nlm.nih.gov/medlineplus/druginfo/drug_Da.html. "Valsartan is used alone or in combination with other medications to treat high blood pressure." Id. at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697015.html.

attack several months." Id.  Dr. Nestola reported that plaintiff's "major problem[s]" were
hypertension, obesity and gout.  Id.  His blood pressure was 120/80.  Id.  Dr. Nestola instructed
plaintiff to "continue diet, weight loss and present meds" and issued prescriptions for Diovan,
Colchicine and Allopurinol.  R. 408-411-12.[3]

2.  *Claimed Disability: Right Thumb Pain and Triggering*

On June 11, 2009, plaintiff was examined by Dr. Robert Carter of Nassau Orthopedic
Surgeons, P.C.  R. 260.  Plaintiff complained of thumb pain and reported "that he fell on his
outstretched right hand at work 6/8/09 while walking up stairs."  Id.  Xrays revealed no fracture;
Dr. Carter's impression was "sprain/contusion right thumb."  Id.  He recommended a thumb
brace, Advil, ice, elevation and a follow-up exam in two weeks, and instructed plaintiff not to
return to work until further notice.  R. 260, 434, 436.[4]  Plaintiff returned to Dr. Carter on July 6,
2009 and reported that the brace helped slightly but he continued to have pain in his thumb.  R.
259.  Following examination, Dr. Carter's impressions were "resolving sprain/post right trigger
thumb."  Id.  Dr. Carter recommended a steroid injection (which plaintiff deferred) and referred
plaintiff to Performance Rehab for physical therapy to wean him off the brace.  Id.  Plaintiff was
instructed not to resume work yet and to return in two weeks for examination by Dr. Montero,
Nassau Orthopedic Surgeons' hand specialist.  R. 259, 441.

––––––––––––––––––––––––

[3]  "Colchicine is used to prevent gout attacks (sudden, severe pain in one or more joints
caused by abnormally high levels of a substance called uric acid in the blood) in adults, and to
relieve the pain of gout attacks when they occur."  MedlinePlus, at
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682711.html.  "Allopurinol is used to
prevent gout attacks, not to treat them once they occur."  MedlinePlus, at
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682673.html.  "It works by reducing the
production of uric acid in the body."  Id.

[4]  At that time, plaintiff was employed by the Levittown School District as a security
officer.  R. 190-91.

Plaintiff received physical therapy at Performance Rehab on July 17, 2009, July 22, 2009, July 28, 2009 and August 3, 2009. R. 284-85, 290-92, 358-59. The August 3d progress report noted plaintiff's complaint of severe pain upon palpation at the right thumb joint (which plaintiff described as "electric shock"), that his right grip strength had decreased "from 45 lbs to 32 lbs since initial evaluation" and that plaintiff reported he was "unable 'to do much' with" his right hand. R. 281.

Dr. Montero examined plaintiff on August 5, 2009 and diagnosed right thumb triggering. R. 258. Dr. Montero discussed treatment options with plaintiff, who declined a cortisone injection and opted for surgical intervention. Id. On August 10, 2009, Dr. Montero reported to the State of New York Workers Compensation Board ("WCB") that plaintiff was temporarily totally disabled due to his thumb injury. R. 446-47. On August 24, 2009, Dr. Montero "fully discussed" plaintiff's surgery with him. R. 276. On August 26, 2009, Dr. Montero reported to the WCB that plaintiff remained temporarily totally disabled. R. 449-50.

Plaintiff underwent trigger thumb release surgery at New Island Hospital on September 8, 2009. R. 247-51. On September 23, 2009, Dr. Montero noted plaintiff had tenderness and decreased range of motion and prescribed physical therapy. R. 275. Plaintiff received physical therapy at Performance Rehab on September 25, 2009, September 28, 2009 and September 30, 2009. R. 284, 288-89, 293-94. Plaintiff returned to Dr. Montero on October 2, 2009 at which time Dr. Montero reported that plaintiff continued to experience tenderness and decreased range of motion and that he would continue physical therapy and return to the office in two weeks. R. 274. Plaintiff received physical therapy at Performance Rehab on October 12, 2009, October 19, 2009 and October 21, 2009. R. 269, 284-85, 295-96. Plaintiff returned to Dr. Montero on October 26, 2009 at which time Dr. Montero reported that plaintiff's range of motion had

improved and he would continue physiotherapy and return to work in one week.  R. 273.  It appears, however, that plaintiff did not continue physical therapy as directed.[5]

Plaintiff returned to Dr. Montero on January 25, 2010, at which time he "complain[ed] of lack of dexterity and weakness" and that "he is unable to fire his gun."  R. 272.  Dr. Montero noted that plaintiff "was instructed to have another month of physical therapy."  Id.  Once again, there is no indication in the record that plaintiff complied.  He returned to Dr. Montero on March 12, 2010 for "follow up of status post right thumb trigger release and osteoarthritis IP joint."  R. 364.  Dr. Montero noted "the patient [is] not working" and reported "significant improvement" upon examination.  Id.  Plaintiff was advised to return to the office in two months.  Id.

Plaintiff returned to Dr. Montero on October 27, 2010 and complained "of weakness in the right hand since the surgery."  R. 457.  Dr. Montero reported plaintiff's grip strength was 80 pounds on the left and 100 pounds on the right, and assessed that plaintiff had a 25% impairment to the right hand.  Id.  On or about October 27, 2010, Dr. Montero reported to the WCB that plaintiff had reached maximum medical improvement with a 25% permanent impairment to his right hand, that plaintiff was working at his pre-injury job and that he had no work limitations.  R. 455-56.

### 3.  *Claimed Disability: Back Problems*

On June 18, 2008, plaintiff was treated by Michael Capogna, D.C. for low back pain.  R. 298.  His treatment included moist heat, massage and trigger point therapy.  Id.  Plaintiff returned over a year later, on October 19, 2009, "with a chief complaint of bilateral lower back pain which [he reported] began without specific cause a few days" earlier.  Id.  Dr. Capogna

---

[5] October 21, 2009 is the last treatment note from Performance Rehab, and no record evidence indicates plaintiff received physical therapy from any other provider.

provided treatment (including moist heat and massage) and noted plaintiff's "past history of same or similar pain" and that an MRI from October 1996 "revealed L4-L5 and L5-S1 disc dessication and disc bulge." Id.  Plaintiff returned two days later, on October 21, 2009 and reported that he felt "a little better" but still had pain in his lower back and his neck was a little stiff.  Id.  Dr. Capogna provided treatment (including moist heat and massage) and advised plaintiff "on home exercises/stretches to help support treatment given in office."  Id.

On January 25, 2010, during a follow-up exam for his hypertension, plaintiff reported to Dr. Nestola that he was experiencing "intermittent low back pain" and requested "muscle relaxant."  R. 331.  Dr. Nestola prescribed Flexeril, one tablet three times a day, for ten days (with one refill).  R. 330-32.[6]

4. *Claimed Disability:  Knee Problems*

On October 13, 2009, plaintiff was examined by Dr. Bradley White (from Nassau Orthopedic Surgeons) pursuant to a referral from Dr. Nestola concerning plaintiff's "increasing problems with both knees."  R. 261.  Dr. White noted:

> Patient is 6-foot-2 inches tall and weighs approximately 400 pounds.  Clinically has crepitus with motion both knees.  No discernible ligamentous laxity or effusions.  Strong quadriceps without quadriceps lag.  Walks easily without cane or crutch.  X-rays show moderately severe degenerative arthritis both knees with early varus deformities.  Impression is that of symptomatic osteoarthritis of knees. Patient may eventually need total joint arthroplasties.  These cannot be entertained until he loses significant weight.  Is apparently to be seen in near future in consultation with reference to possible gastroplasty.

Id.  Plaintiff was instructed to take antiflammatories as needed and to return to Dr. White as

_____

[6] Flexeril is a brand name for Cyclobenzaprine, a muscle relaxant "used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries."  MedlinePlus, at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html.

needed "with any flareups." Id.

On July 29, 2010, plaintiff sought evaluation of his knee pain from Dr. Thomas

Chambers. R. 372-74. Plaintiff reported "a history of Osgood-Schlatter of both knees" and "a

long history of bilateral knee pain" which had "become progressively worse." R. 372.[7] Dr.

Chambers noted that plaintiff was "very overweight" and had a history of gout, although he no

longer took Allopurinol or Colchecine. R. 372-73. Upon examination of plaintiff's knees, Dr.

Chambers reported:

> There is mild varus alignment. No palpable ossicles of his tibial tubercles. Mild
> medial joint line tenderness bilaterally, but it is very mild. . . . No instability. 0 to
> 120 degrees range of motion. Good musculature. Fairly fit-appearing legs.
> Distal light touch, motor, and pulses are intact.

R. 373. Bilateral knee X-rays performed on site revealed the following: "ossicles of both tibial

tubercles. Mild osteoarthritic changes of his medial compartment. Mild patellofemoral

degenerative changes." Id. Dr. Chambers assessed that plaintiff suffered from obesity, gout and

"knee degenerative joint disease" and concluded:

> His knees are far from bad enough to consider knee replacement at this time at his
> young age and heavy weight. I think he is probably demonstrating some low
> level gout exacerbating his osteoarthritis as well as his obesity. I have asked him
> to consider lap band. I have talked to him about his diet. . . .

Id. Dr. Chambers also prescribed Allopurinol and Colchecine, and instructed plaintiff to follow

up with Dr. Bornfreund for treatment of his gout. Id.[8]

Plaintiff returned to Dr. Chambers on February 15, 2011. R. 461-62. Plaintiff reported

---

[7] "Osgood-Schlatter disease is a painful swelling of the bump on the upper part of the
shinbone, just below the knee. This bump is called the anterior tibial tubercle." MedlinePlus, at
http://www.nlm.nih.gov/medlineplus/ency/article/001258.htm.

[8] There are no treatment records from Dr Bornfreund in the record.

that his left knee was "much more bothersome lately" and he was having difficulty sleeping because of the pain. R. 461. Plaintiff stated he felt "a little unsteady at times" and had "pain getting out of the chair or climbing stairs." Id. According to plaintiff, he had similar problems with his right knee but they were not as severe. Id. Dr. Chambers noted that plaintiff was a "[m]arkedly overweight middle-aged male in no acute distress." Id. Examination of plaintiff's left knee revealed

> tenderness over the tibial tubercle with primarily tibial tubercle consistent with old Osgood-Schlatter's. Moderate to mild severe patellofemoral crepitus. Mild medial joint line tenderness. No instability. Alignment looks normal. No effusion. He does have some prepatellar swelling. The extensor mechanism is intact to palpation. Distal light touch, motor, and pulses are intact. Normal musculature.

Id. Examination of the right knee revealed no tenderness over the tibial tubercle or prepatellar swelling "but otherwise symmetric findings." Id. Bilateral knee X-rays performed on site revealed

> minimal weightbearing joint space narrowing. It has mildly affected the medial compartments bilaterally, perhaps left a little bit more than right. He has some patellofemoral degenerative changes more pronounced on the left than the right. He has evidence of an old Osgood-Schlatter's with ossicles in the tibial tubercle. He does have shallow trochlea as well. No destructive lesions or fracture. Alignment appears normal.

R. 462. Dr. Chambers diagnosed "[l]eft knee tibial tubercle enthesitis and patellofemoral degenerative joint disease" and set forth the following treatment plan:

> We have discussed the options with him. At his weight and age, I think TKR would be a bad idea.[9] I think they will wear out too soon. He may be a candidate

---

[9] Knee joint replacement (also known as total knee replacement) "is surgery to replace a knee joint with a man-made joint. The artificial joint is called a prosthesis." MedlinePlus, at http://www.nlm.nih.gov/medlineplus/ency/article/002974.htm.

for PFR.[10]  I would want to get an MRI before we will consider that.  Today, his more symptomatic problem is tibial tubercle enthesitis.[11]  I will start him on Pennsaid drops.[12]  I have also injected the knee with 1 cc of Celestone to help with the patellofemoral DJD.[13]  I want him to work on aquatic exercises to try and get some weight loss.  That will be the best thing for his knees.  Follow up visit as needed.

Id.

C.  Consultative Examinations

1.  *Dr. Leon Sultan*

Orthopedic surgeon Dr. Leon Sultan conducted a consultative examination of plaintiff on

November 11, 2009.  R. 361-62.[14]  Plaintiff stated that he weighed 340 pounds, that he was right-

hand dominant and that he no longer had any right thumb pain but still experienced some

_____

[10]  "Patellofemoral replacement.  During this "partial" knee replacement, worn down bone and cartilage surfaces are removed and replaced with metal and polyethylene (plastic) implants."  See OrthoInfo, a service of the American Academy of Orthopaedic Surgeons, available at http://orthoinfo.aaos.org/topic.cfm?topic=A00590.

[11]  Enthesitis is defined as "[t]raumatic disease occurring at the point of attachment of skeletal muscles to bone, where recurring stress causes inflammation and often fibrosis and calcification."  *The American Heritage® Stedman's Medical Dictionary*, Houghton Mifflin Company, accessed at Dictionary.com, http://dictionary.reference.com/browse/enthesitis.

[12]  Pennsaid is also known as Diclofenac Topical.  See MedlinePlus, a service of the U.S. National Library of Medicine and the National Institutes of Health, available at http://www.nlm.nih.gov/medlineplus/druginfo/drug_Pa.html.  "Diclofenac topical liquid (Pennsaid) is used to relieve osteoarthritis pain in the knees."  Id. at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a611002.html.

[13]  Celestone Soluspan is a corticosteroid which may be injected into the knee joint as a treatment for pain associated with osteoarthritis.  See Wittich, Christopher M. et al., *Musculoskeletal Injection*, 84(9) MAYO CLINIC PROCEEDINGS 831-37, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2735433.

[14]  Dr. Sultan performed the consultative examination at the request of Wright Managed Care, LLC, presumably in conjunction with plaintiff's claim for workers' compensation benefits. R. 361.  Thus, Dr. Sultan's examination and report was limited to an assessment of plaintiff's right thumb pain.  R. 361-62.

weakness and stiffness.  R. 361.  Upon examination of plaintiff's right thumb, Dr. Sultan noted

"some localized tenderness on deep palpation" and "[a]n ongoing mild partial right thumb/hand

disability."  R. 362.  Dr. Sultan recommended the following:

> Continued postoperative therapy treatments are in order at a rate of 2-3 times a
> week for another four weeks after which point in time he will have reached a
> point of maximum medical improvement and may resume work activity thereafter
> without restrictions.  At present, he may return to work in a modified position
> doing light or sedentary work activity if such employment is available.

Id.

### 2. *Dr. Harriett Steinert*

On August 2, 2010, Dr. Harriett Steinert conducted a consultative orthopedic

examination of plaintiff.  R. 379-82.  Plaintiff reported "spasms and stiffness on the right side of

his lumbar spine," back pain with "any type of physical activity" and radiating pain to his right

foot.  R. 381.  Plaintiff stated he could "sit for 30 minutes and walk without difficulty but he gets

spasms when he stops walking."  Id.  Plaintiff also reported bilateral knee pain, decreased

strength in both hands and decreased movement of his right thumb.  Id.  His blood pressure was

198/92; plaintiff stated "[h]e has hypertension for which he takes medication daily.  Id.  Dr.

Steinert noted "[i]n addition to the above problems, the patient is massively obese."  Id.

Dr. Steinert observed that plaintiff was able to get on and off the examination table by

himself without difficulty.  Id.  He had full range of motion in all joints of all four extremities.

Id.  There were crepitations palpable in plaintiff's left knee.  Id.  There was no muscle atrophy,

no sensory or motor deficits in any extremity and no inflammation, swelling, deformity or

tenderness to palpation of any joints.  Id.  Although plaintiff reported a decrease in grip strength,

examination revealed his grip strength was normal and equal bilaterally (5/5).  Id.  Plaintiff's

fine motor and gross motor skills were normal in both hands, and he could touch thumb to

fingers without difficulty except "it was a little struggle for him to touch the right fifth finger."
Id. He had no difficulty removing a letter from an envelope. Id. His deep tendon reflexes and
peripheral pulses were normal and equal in all extremities. Id. He had no pedal edema in either
lower extremity. Id. Plaintiff could flex at the waist 80 degrees (normal is 90 degrees), extend
15 degrees (normal is 25 degrees) and laterally flex 15 degrees (normal is 25 degrees). R. 379,
382. There was no tenderness to palpation of the spine or paraspinous muscles. R. 382. Straight
leg raises were negative bilaterally. Id. Plaintiff was able to walk across the room with a normal
gait without assist devices. Id. He could walk on his toes but not his heels. Id. Plaintiff could
not tandem walk or squat down. Id.

According to Dr. Steinert's diagnosis, plaintiff suffered from degenerative disc disease of
the lumbar spine, hypertension, morbid obesity and arthritis of both knees. Id. Dr. Steinert also
noted "Limitations of ADL's and Work Activity: He has pain in his lumbar spine and both
knees." Id.

### 3. *Dr. Brian Forman*

On August 2, 2010, plaintiff underwent X-rays of his left knee and lumbar spine at
Conway Medical Center for purposes of "disability determination." R. 376-77.[15] According to
Dr. Brian Forman, plaintiff's left knee X-rays revealed the following: "[M]ild medial and lateral
compartment joint space narrowing with mild degenerative change in the patellofemoral
compartment. There is an irregular tibial tuberosity without evidence of acute fracture. No joint
effusion is present." R. 376. Dr. Forman's impression was that the X-rays indicated "[f]ew
degenerative changes as described" and "[n]o acute plain film abnormality." R. 376. Dr.

---

[15] Although the X-rays were performed the same day as Dr. Steinert's consultative
examination, it is unclear whether she or someone else ordered the radiology report.

Forman noted that an MRI may be useful if plaintiff's symptoms persisted or worsened.

Dr. Forman noted plaintiff's "body habitus" slightly limited the three views of his lumbar

spine.  R. 377.  Those X-rays revealed the following:

> The lumbar vertebrae are normal in height and alignment.  There is minimal
> multilevel joint space narrowing with moderate endplate spondylosis.  There is
> moderate lower lumbar spine facet arthropathy and some sclerosis of spinous
> processes.  There are bridging osteophytes present anterior to the upper lumbar
> vertebrae and lower thoracic vertebrae.  The SI joints are symmetric.  There is a
> 3.5 cm rim calcified structure anterior to thoracolumbar junction seen only on the
> lateral view.  The structure[ ] is of uncertain significance and should be correlated
> clinically.

Id.  Dr. Forman's impression was that the X-rays indicated "[d]egenerative changes as

described" and "[n]o acute plain film finding."  Id.  Dr. Forman noted that an MRI may be useful

if plaintiff's symptoms persisted or worsened.  Id.

### 4. *Dr. Joseph Gonzalez*

On August 24, 2010, Dr. Joseph Gonzalez issued a consultative non-examining

assessment of plaintiff's residual functional capacity.  R. 383-90.  Based on his review of

plaintiff's medical records, Dr. Gonzalez concluded the following:

Plaintiff could frequently lift and/or carry ten pounds and occasionally lift and/or carry

twenty pounds.  R. 384.  He could stand and/or walk for a total of about 6 hours in an 8-hour

workday and sit for a total of about 6 hours in an 8-hour workday.  Id.  Plaintiff's ability to push

and/or pull was limited in his lower extremities.  Id.  He could frequently balance, stoop, kneel

and crouch; he could occasionally crawl and climb ramps and stairs; he could never climb

ladders, ropes or scaffolds.  R. 385.  Plaintiff had no manipulative, visual, communicative or

environmental limitations.  R. 386-87.

### 5. *Dr. Mary Lang*

On January 11, 2011, Dr. Mary Lang issued a consultative non-examining assessment of plaintiff's residual functional capacity. R. 426-33.  Based on her review of plaintiff's medical records, Dr. Lang concluded the following:

Plaintiff could frequently lift and/or carry ten pounds and occasionally lift and/or carry twenty pounds.  R. 427.  He could stand and/or walk for a total of about 6 hours in an 8-hour workday and sit for a total of about 6 hours in an 8-hour workday.  Id.  Plaintiff's ability to push and/or pull was limited in his lower extremities.  Id.  He could frequently balance and stoop; he could occasionally kneel, crouch and crawl; he could occasionally climb ramps, stairs, ladders, ropes and scaffolds.  R. 428.  Plaintiff had no manipulative, visual or communicative limitations. R. 429-30.  Due to his obesity, plaintiff must avoid concentrated exposure to extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation and hazards (e.g. machinery and heights). R. 430.

D.  Plaintiff's Hearing Testimony[16]

Plaintiff was employed as a New York City police officer "for most of [his] adult life." R. 38.  He worked "in the field" responding to service calls.  R. 39.  His job was "mostly physical" and involved lifting; the heaviest weight he had to lift by himself was "[p]robably 300 pounds."  Id.  Five or ten percent of his time was spent doing "rudimentary" paperwork.  R. 39-40.  For "about three years" while plaintiff was employed as a police officer, he also drove a school bus for his local school district.  R. 38, 40.  After plaintiff retired from the police department he worked as an assistant for several law firms.  R. 38, 41.  His duties included

---

[16]  Although the ALJ also obtained testimony from Vocational Expert Kristan Cicero, it is not summarized herein because neither party challenges her testimony or the ALJ's reliance thereon.

bringing files to court, assisting attorneys with exhibits and driving attorneys to trials. R. 41. For "approximately 14 months" while he was employed as a legal assistant, plaintiff also worked as a "security agent" for his local school district. R. 38. During his work as a security agent, plaintiff fell while walking up steps and injured his right hand and thumb, which required corrective surgery and "contributed to loss of use of [plaintiff's] right hand." Id. He has been unable to work since June 8, 2009 because of his knees, back "and the medication [he is] required to take for some physical ailments." Id.

Plaintiff's knee problems began as a childhood disease. R. 41. According to plaintiff, "over the years through athletics as a young man and then later on in my job as a police officer I sustained injuries to both of those knees. Now in middle age it's developed into severe arthritis." R. 42. Both of plaintiff's knees make "[c]licking sounds similar to maybe if you crack your knuckle." R. 43. Plaintiff had "severe pain at times" primarily in his left knee, brought on by over-use. Id. Plaintiff described his difficulty getting up from a seated position:

> I have to make sure my knee is properly aligned. It seems to have a floating effect, especially on my left knee. If I was to get up from this chair I'd have to not put weight on my left leg until I was certain the knee was like – It's like a wobbling effect is about the best way I can put it. It wouldn't support me.

R. 43-44. Plaintiff could walk fifty or sixty feet before having to stop "or preferably sit down" because he was tired or in pain. R. 44. After sitting for about five minutes, he could walk another fifty or sixty feet. Id. His knee (and his back) bothers him after he stands in one place for ten minutes. Id. Plaintiff's knee pain prevents him from sleeping more than four hours at a time, at which point "[i]t hurts. It throbs, it's arthritic and I have to apply ice." R. 45. As a result, plaintiff feels fatigued during the day and falls asleep "just about" daily for about an hour. R. 54. He cannot bend from his knees. R. 47. Total knee replacement was considered but

rejected by his doctor due to plaintiff's weight, and he had not lost enough weight to allow the surgery to go forward.  R. 42.  Plaintiff's weight had increased "significantly" over the past ten or twelve years; at the time of the hearing he weighed 380 pounds.  Id.  Although Dr. Chambers recommended lap band surgery, plaintiff continued to resist that option because he believed his weight gain was due to inactivity, not overeating.  R. 51.  Because his knee condition limited his exercise options, plaintiff was attempting to lose weight by doing water exercises.  R. 42.

After sitting in a chair for ten to thirty minutes (depending "on the comfort level of the chair"), plaintiff's back begins to bother him.  R. 44.  Specifically, he experiences numbness down to his right foot caused by irritation of his sciatic nerve, which he relieves by temporarily changing position.  R. 44-45.  Plaintiff is most comfortable "sitting down, leaning back at approximately a 45 degree angle."  R. 45.  The pain in his back varies depending on his activity level.  Id.  His back hurts if he tries to walk too far, or lift too much and he can no longer play golf.  R. 45-46.  Plaintiff could lift twenty or thirty pounds as a single event, but only from off the table (not the floor) and his back would hurt as a result.  R. 46.  Repeated lifting, regardless of the amount of weight, causes pain, stiffness and loss of motion on the right side of his back. Id.  Plaintiff could bend his back "slightly," perhaps thirty degrees.  R. 47.  He "tr[ies] not to take pain killers" and relieves his back pain with ice and stretching.  R. 49.  He takes Cyclobenzaprine [Flexeril] "primarily for back spasms" but–although it provides relief–the medication makes him "groggy" and he cannot operate a motor vehicle while taking it.  Id.

Plaintiff's gout is triggered by his dietary choices.  R. 50.  It flared up about a week prior to the hearing: plaintiff "found out the hard way" he should not eat salmon, which is now "on the list for gout."  Id.  Before that flare-up, plaintiff last experienced a gout episode "probably the end of January."  Id.  When his gout flares up, it causes an improper gait which "throws out [his]

-16-

knee and [his] back." Id.

Prior to plaintiff's thumb trigger release surgery, he "couldn't use [his] right arm and hand at all;" after the surgery he "can use it, but it's a lack of strength. It's not a pain issue, it's a lack of dexterity and strength in the right hand." R. 51-52. Plaintiff completed the prescribed course of physical therapy following his surgery. R. 52. He was given exercises to do at home but plaintiff explained that he no longer did them: "I reached my maximum medical, there's a word for it. It's not going to get any better no matter what I do." Id. Plaintiff lacks coordination in his right hand, especially with smaller items. R. 52-53. He cannot use a can opener because his hand "gets fatigues and almost like a muscle spasm." R. 53. He cannot handle a weapon anymore; he tried but could not pass the course due to lack of accuracy. Id. Plaintiff is able to write his "signature, maybe fill out a check, an envelope" but has not attempted to write for longer periods and believes he would have difficulty doing so. Id.

Plaintiff does "little to nothing" in an average day. Id. He wakes up at six or seven a.m., bathes and gets dressed but does little physical activity. Id. He reads and pays bills; his wife does the household chores and the cooking. Id. She works five days a week and usually pre-prepares plaintiff's meals for him. R. 48. Plaintiff has no difficulty driving and drives his wife to the store (although he usually stays in the car). R. 47-48. He can drive an hour at a time, but getting in and out of the car is difficult, especially on the driver's side because of his left knee pain. R. 48. Plaintiff keeps a cane in the car which he "sometimes" uses to exit the vehicle, depending on the length of the trip and where he is going. Id. Plaintiff also uses a back brace and a knee brace; all of his assistive devices were "recommended" but not prescribed by a doctor. R. 49-50.

-17-

### III.  LEGAL STANDARDS

A.  Standard of Review

  In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'"  Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)).

  The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard."  Brault v. Social Sec. Admin, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence.  See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Lamay v. Commissioner of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).  "When there are gaps in the

-18-

administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

B.  Statutory Disability

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  In addition, a person is eligible for disability benefits under the SSA only if

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step sequential analysis:

1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.  If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age,

education, and work experience.

4.  If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.  If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

Rolon v. Commissioner of Soc. Sec., No. 12 Civ. 4808, 2014 WL 241305, at *6 (S.D.N.Y. Jan. 22, 2014); see 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v). The claimant bears the burden of proof as to the first four steps of the process. See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step. See id.; 20 C.F.R. § 404.1560(c)(2). At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy. See Butts v. Barnhart, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## IV. THE ALJ'S DECISION

The ALJ properly applied the five-step sequential analysis described above and concluded that plaintiff was not disabled under the meaning of the SSA. R. 17-26. At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since June 8, 2009, the alleged onset date of his disability. R. 19. At step two, the ALJ concluded that plaintiff's "degenerative disc disease, a history of trigger finger release and arthritis, obesity, degenerative joint disease of the knees, gout, and hypertension" constituted "severe impairments" within the meaning of the SSA. Id. At step three, the ALJ determined that plaintiff's impairments (individually or combined) did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. Next, the

ALJ determined that plaintiff had the residual functional capacity ("RFC") "to perform a

significant range of sedentary work as defined in 20 CFR 404.1567(a)."  R. 20.  The ALJ

specifically concluded that plaintiff

> is able to lift and carry up to 10 pounds occasionally and lesser amounts
> frequently, sit for 6 hours in an 8-hour day, and stand and walk occasionally.  The
> claimant can frequently push and pull with his lower extremities, balance, and
> stoop; occasionally climb ramps and stairs, kneel, crouch, and crawl; cannot
> climb ropes, ladders, or scaffolds; and must avoid extreme heat, humidity, fumes,
> dust, gas, odors, chemicals, hazardous machinery, and unprotected heights.

Id.  At step four, the ALJ determined that plaintiff "is unable to perform any past relevant work."

R. 25.  At step five, the ALJ determined that plaintiff acquired the following work skills from his

past relevant work: guarding; interviewing; monitoring; and the performance of general clerical

work.  R. 25.  The ALJ considered plaintiff's RFC, age, education and work experience in

conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.

R. 25-26.  Based on testimony from the vocational expert, the ALJ determined that plaintiff's

acquired work skills "are transferable to other occupations with jobs existing in significant

numbers in the national economy."  Id.  The ALJ thus determined:

> although the claimant's additional limitations do not allow the claimant to
> perform the full range of sedentary work, considering the claimant's age,
> education and transferable work skills, a finding of "not disabled" is appropriate
> under the framework of Medical-Vocational Rule 201.15.

R. 26.  The ALJ concluded that plaintiff had not been "disabled" under the SSA from June 8,

2009 through May 19, 2011, the date of the ALJ's decision.  R. 17, 26.

## V.  ASSESSING THE ALJ'S FINDINGS

Plaintiff challenges the Commissioner's decision on four grounds: (1) the ALJ erred in

failing to find that plaintiff's obesity constitutes an impairment or combination of impairments

that meets or medically equals "Listed Impairment" 1.00(Q);[17] (2) the ALJ failed to properly

evaluate the opinion of plaintiff's treating physician; (3) the ALJ failed to properly evaluate

plaintiff's subjective complaints of pain; and (4) the ALJ's RFC determination is not supported

by substantial evidence.  Plaintiff's Motion on the Pleadings ("Pl. Motion") (unpaginated) at 3-

15.  Defendant maintains that the Commissioner's decision "is supported by substantial evidence

in the record and is based upon the application of the correct legal standards."  Memorandum of

Law in Support of the Commissioner's Cross Motion for Judgment on the Pleadings ("Def.

Mem.") at 1.

A.  "Listed Impairment" 1.00(Q)

      Plaintiff alleges the ALJ erred in failing to find that plaintiff's obesity constitutes an

impairment or combination of impairments that meets or medically equals "Listed Impairment"

1.00(Q).  Pl. Motion at 3-4.[18]  Section 1.00(Q) provides as follows:

> Effects of obesity.  Obesity is a medically determinable impairment that is often
> associated with disturbance of the musculoskeletal system, and disturbance of this
> system can be a major cause of disability in individuals with obesity.  The
> combined effects of obesity with musculoskeletal impairments can be greater than
> the effects of each of the impairments considered separately.  Therefore, when
> determining whether an individual with obesity has a listing-level impairment or
> combination of impairments, and when assessing a claim at other steps of the
> sequential evaluation process, including when assessing an individual's residual
> functional capacity, adjudicators must consider any additional and cumulative
> effects of obesity.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(Q).  Thus, section 1.00(Q) is not, in and of itself, a

_____

[17]  This point was not raised in the "Argument" section of plaintiff's motion; it hazily
materialized within plaintiff's recitation of the medical evidence in the administrative record.
See Pl. Motion at 3-4.  Defendant noted the same but construed it as an argument and opposed it
in her cross-motion.  See Def. Mem. at 16-17.

[18]  Plaintiff correctly quoted the substance of Section 1.00(Q), but incorrectly cited the
Listing as 1.00(G).

"Listed Impairment" (contrary to plaintiff's categorization); rather, it is an introductory paragraph intended to "provide guidance about the potential effects obesity has in causing or contributing to impairments" in the musculoskeletal system. SSR 02-1p, 67 Fed. Reg. 57859-02, 2002 WL 31026506, at *57860 (Sept. 12, 2002). Plaintiff's argument is, therefore, misplaced.

In any event, the ALJ properly considered the cumulative impact of plaintiff's obesity at all steps of the sequential evaluation process. At step two, the ALJ found that plaintiff's obesity constituted a "severe impairment." R. 19. At step three, the ALJ determined that plaintiff's obesity, together with his degenerative disc disease, arthritis, degenerative joint disease and gout, did not meet or medically equal a listed impairment because the record evidence "fails to indicate that the claimant's condition resulted in an inability to ambulate effectively as defined by Social Security Regulations." R. 19-20.[19] The ALJ also considered the impact of plaintiff's obesity on his RFC:

> The claimant also suffers from obesity, which is a severe impairment. He has a reported height of 74 inches and was noted to weigh approximately 400 pounds in October 2009. In August 2010, the claimant was noted to weigh 325 pounds. The undersigned has evaluated this impairment according to the requirement of Social Security Ruling 02-1p, as required. The medical evidence confirms that the claimant has a body mass index (BMI) of greater than 35, which represents "extreme" obesity. According to the National Institutes of Health (NIH), it is individuals of "extreme" obesity, as defined above, who suffer the greatest risk of

---

[19] Listing 1.02 requires "involvement of one major peripheral weight-bearing joint . . . resulting in inability to ambulate effectively, as defined in 1.00(B)(2)(b)." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02(A). Section 1.00(B)(2)(b) defines the inability to ambulate effectively as an "extreme limitation of the ability to walk" characterized by "insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). Examples of "ineffective ambulation" include: the inability to walk without a walker, two crutches, or two canes; the inability to use public transportation or carry out routine ambulatory activities (e.g., shopping and banking); and the inability to walk a block at a reasonable pace on rough or uneven surfaces. See 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

developing obesity-related impairments. Treatment notes reveal that despite his obesity, the claimant was able to move about generally well and sustain consistent function. Objective examination has revealed that the claimant had good muscle tone, despite his increased body mass. Additionally, there has been no objective evidence showing that the claimant suffered from significant sleep apnea, heart disease, or uncontrollable blood pressure. The medical evidence fails to indicate that the claimant's ability to manipulate had been negatively impacted by the presence of adipose tissue. No shortness of breath or wheezing was ever noted upon examination.

R. 24-25 (internal citations to administrative record omitted). The ALJ concluded that plaintiff's obesity did not negatively impact his RFC beyond the limitations already found. R. 25. Accordingly, there is no basis to reverse the Commissioner's decision on the ground that the ALJ failed to fully consider any additional and cumulative effects of plaintiff's obesity.

B. Treating Physician Rule

In considering any medical opinions set forth in the administrative record, the ALJ must give controlling weight to the opinion of a treating physician if it is well-supported by the medical record and is not inconsistent with other substantial record evidence. See Green-Younger, 335 F.3d at 106; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). When the treating physician's opinion is not given controlling weight, the ALJ must determine the amount of weight to be assigned to the treating source's opinion based upon consideration of the following factors: (1) the length, nature and extent of treatment and the frequency of examination; (2) the relevant evidence presented by the treating source in support of his opinion; (3) whether the opinion is consistent with the record as a whole; (4) whether the treating source is a specialist in the area relating to his opinion; and (5) other factors which tend to support or contradict the opinion. See Shaw, 221 F.3d at 134; 20 C.F.R. § 404.1527(d)(2)-(6). A "treating source" is a claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant] with medical treatment or evaluation and who has, or

has had, an ongoing treatment relationship with [the claimant]."[20]  20 C.F.R. §§ 404.1502, 416.902.

Here, plaintiff discusses the treating physician rule and argues: "The ALJ's refusal to consider, or even acknowledge these factors–and her failure to specify what weight she did assign to the opinion of Dr. Chambers–constitutes error requiring reversal of the Commissioner's decision."  Pl. Motion at 10- 11.  Plaintiff appears to argue that the ALJ disregarded an opinion rendered by Dr. Chambers but does not specify the "opinion" to which he refers.  Although Dr. Chambers opined that plaintiff suffered from degenerative joint disease in his knees (R. 373, 462), the record does not contain an "opinion" from Dr. Chambers setting forth any resulting exertional limitations supporting plaintiff's disability allegations.  Plaintiff does not argue that the ALJ should have obtained a medical source statement from Dr. Chambers; instead, plaintiff argues:

> The law is clear that mere citation to an incomplete record is alone insufficient grounds upon which to rest a rejection of treating source evidence.  Where the Commissioner believes the clinical basis of a treating source's opinion is lacking, he is obligated to make an affirmative inquiry of the treating physician seeking the support data; he may not simply assume that the required clinical basis does not exist.

Pl. Motion at 12.[21]  Plaintiff's argument is puzzling because nowhere in the ALJ's decision did

––––––––––––––––––––––––––

[20]  An "ongoing treatment relationship" exists where the claimant "see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)."  20 C.F.R. § 404.1502.  The SSA "may consider an acceptable medical source who has treated or evaluated [the claimant] only a few times . . . to be [the claimant's] treating source if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)."  Id.

[21]  At the time of plaintiff's hearing, Social Security Regulations required an ALJ to re-contact a treating source when the evidence the Commissioner received from that source was inadequate to determine whether the plaintiff was disabled.  See 20 C.F.R. § 416.912(e)(2011).  "Effective March 26, 2012, the Commissioner amended 20 C.F.R. § 416.912 to remove former

she "reject" any "opinion" from Dr. Chambers on the ground that it lacked a clinical basis (or on any other ground). R. 17-26. Plaintiff further argues: "Because no such affirmative inquiry appears to have been conducted in this case, the ALJ erred in rejecting *Dr. Leone's opinions for their presumed inconsistencies or lack of support*. Pl. Motion at 12 (emphasis added). Plaintiff's argument is clearly misplaced and, indeed, the cryptic reference to "Dr. Leone" suggests that the argument was simply "cut and pasted" from a brief in a separate action. In sum, there is no basis to reverse the Commissioner's decision on the ground that the ALJ failed to evaluate Dr. Chambers' opinion in accordance with the treating physician rule.

C.  The ALJ's Assessment of Plaintiff's Credibility

　　　"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted). In deciding how much weight to give to a claimant's subjective complaints, the ALJ must follow a two-step process set forth in the Social Security regulations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. Id. The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions,

--------

paragraph (e) and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances." Lowry v. Astrue, F.App'x  801, 805 n.2 (2d Cir. 2012).

> his daily activities, his efforts to work, or any other relevant statements he makes
> to medical sources during the course of examination or treatment, or to the
> agency during interviews, on applications, in letters, and in testimony in its
> administrative proceedings. 20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. §
> 404.1529(a); S.S.R. 96–7p.

Genier, 606 F.3d at 49 (internal quotation marks and brackets omitted).  "[W]here the ALJ finds

that the medical evidence does not substantiate the claimant's allegations [of pain and other

limitations], the ALJ must assess the claimant's credibility by considering seven factors

enumerated in the Social Security regulations."  Rivera v. Astrue, No. 10 CV 4324, 2012 WL

3614323, at *14 (E.D.N.Y. Aug. 21, 2012).  These factors are:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and
> intensity of the pain; (3) precipitating and aggravating factors; (4) the type,
> dosage, effectiveness, and side effects of any medications taken to alleviate the
> pain; (5) any treatment, other than medication, that the claimant has received; (6)
> any other measures that the claimant employs to relieve the pain; and (7) other
> factors concerning the claimant's functional limitations and restrictions as a result
> of the pain.

Meadors v. Astrue, 370 F.App'x 179, 184 n.1 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)

(3)(i)-(vii)).

> "Under the substantial evidence standard, a credibility finding made by an ALJ is entitled

to deference by a reviewing court."  Acevedo v. Astrue, No. 11 Civ. 8853, 2012 WL 4377323, at

*11 (S.D.N.Y. Sept. 4, 2012) (Report & Recommendation), adopted by 2012 WL 4376296

(S.D.N.Y. Sept. 24, 2012).  Nevertheless, "[a]n ALJ who finds that a claimant is not credible

must do so 'explicitly and with sufficient specificity to enable the Court to decide whether there

are legitimate reasons for the ALJ's disbelief and whether his determination is supported by

substantial evidence.'"  Rivera, 2012 WL 3614323, at *14 (quoting Taub v. Astrue, No. 10 Civ.

2526, 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011)).

> Here, the ALJ set forth her credibility determination as follows:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the above residual functional capacity assessment. Treatment notes indicate that the claimant required limited treatment and medication for his impairments and findings upon examination were generally less than significant. Indeed, medical reports fail to indicate that the claimant's ability to ambulate was compromised in any way or that the claimant required the use of a cane or other ambulatory aide. Treatment notes reveal that the claimant generally had intact strength and sensation with negative straight leg raising. The claimant's reports to his physicians have also been inconsistent with his reports to the undersigned. Upon examination on November 24, 2009, the claimant reported that his progress post trigger finger release was satisfactory and that he planned to return to work, "soon." On January 25, 2010, the claimant reported only intermittent low back pain. On October 27, 2010, the claimant presented for a routine office visit with no complaints. While the claimant has stated that he was unable to work as a result of his medical condition, he routinely reported to his physicians that he was "retired" from work. Despite the claimant's allegations of such significant pain and limitations, treatment notes also reveal that the claimant was not prescribed any prescription or narcotic pain medication. Although the claimant reported in February 2011, that he did not like the way narcotic pain medications made him feel, he did not report that he was allergic to them and medical records fail to indicate any narcotic drug or other prescription pain medication trials.

The claimant's activities of daily living are inconsistent with his allegations of such significant functional limitations, but are fully consistent with the residual functional capacity described above. The claimant testified that he was able to read and drive for limited periods of time. In May 2010, the claimant reported that he was able to write legibly and completely, care for his personal needs, read, watch television, feed his dogs, shop for food items, prepare meals weekly, water his lawn, drive daily, shop using the phone, mail, or the computer, manage his money, socialize with others on a weekly basis, and leave his home unaccompanied. See Exhibit 6E. The claimant reported that he was able to travel to New York in October 2010 and also play with [his] granddaughter. See Exhibit 11E.

R. 22 (internal citations to record omitted).

Plaintiff argues that the ALJ failed to properly evaluate plaintiff's subjective complaints

of pain because:

The ALJ attempts to use Plaintiff's testimony regarding activities of daily living as evidence of his ability to do sedentary work. The only such

activities he cites are that he uses a cane, can drive short distances, occasionally drives his wife to the store, however, he remains the car waiting for her, dresses, receives visitors, and watches television. These limited daily activities are hardly indicative of an ability to sit for six hours in an eight-hour day on a sustained basis as required by substantial gainful activity at the sedentary exertional level. In fact, the claimant testified that he only sits for short periods of time due to excruciating back pain. A finding that a witness is not credible must be set forth with sufficient specificity to permit intelligible plenary review of the record.

Pl. Motion at 15-16. Plaintiff's argument is confusing. He seemingly conflates the ALJ's required consideration of plaintiff's daily activities in the context of her credibility assessment (resulting in her determination that plaintiff's daily activities were inconsistent with his subjective complaints of pain and functional limitations (R. 22)) with the ALJ's ultimate determination that plaintiff retained the RFC to perform sedentary work (with specific limitations). In any event, plaintiff's overarching challenge to the ALJ's credibility determination is based on legal–not evidentiary–error. The gist of his argument appears to be that the ALJ failed to set forth with sufficient specificity her reasons for finding plaintiff's subjective complaints not credible. To the contrary, the ALJ correctly applied the two-step process described above to assess plaintiff's subjective complaints of pain and associated functional limitations, and sufficiently explained her rationale for finding plaintiff's subjective complaints not credible. R. 22. Accordingly, there is no basis to reverse the Commissioner's decision because of a legal error in the ALJ's assessment of plaintiff's credibility.

D. The ALJ's RFC Determination

The ALJ found, "[a]fter careful consideration of the entire record," that plaintiff retained the functional capacity "to perform a significant range of sedentary work as defined in 20 CFR 404.1567(a)." R. 20. The ALJ specifically concluded that plaintiff

is able to lift and carry up to 10 pounds occasionally and lesser amounts

-29-

frequently, sit for 6 hours in an 8-hour day, and stand and walk occasionally. The
claimant can frequently push and pull with his lower extremities, balance, and
stoop; occasionally climb ramps and stairs, kneel, crouch, and crawl; cannot
climb ropes, ladders, or scaffolds; and must avoid extreme heat, humidity, fumes,
dust, gas, odors, chemicals, hazardous machinery, and unprotected heights.

Id. Pursuant to Social Security Regulations:

> Sedentary work involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one which involves sitting, a certain
> amount of walking and standing is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

20 C.F.R. § 404.1567(a). "'Occasionally' means occurring from very little up to one-third of the

time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion,

periods of standing or walking should generally total no more than about 2 hours of an 8-hour

workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR

83-10, 1983 WL 31251, at *5. "A finding as to RFC will be upheld on review when there is

substantial evidence in the record to support the requirements listed in the regulations." Jiminez

v. Astrue, No. 12 Civ. 3477, 2013 WL 4400533, at *12 (S.D.N.Y. Aug. 14, 2013) (quotation

marks and citation omitted).

Here, plaintiff argues that the ALJ's RFC determination is not supported by substantial

evidence because it is based "on her distorted interpretations of the reports offered by Dr.

Chambers and of Plaintiff's testimony as to his physical capabilities." As discussed above, the

ALJ did not find plaintiff's subjective complaints credible and plaintiff failed to proffer a basis

for reversing that determination. I agree, however, that the ALJ's RFC determination was

improperly based–at least in part–upon "her distorted interpretations" of Dr. Chambers' reports.

In determining plaintiff's RFC, the ALJ noted: "On July 29, 2010, Dr. Thomas Chambers

reported that the claimant's knees were far from bad enough to consider knee replacement" and accorded this opinion "significant weight." R. 23. In actuality, Dr. Chambers stated: "His knees are far from bad enough to consider knee replacement *at this time at his young age and his heavy weight.*" R. 373 (emphasis added). The ALJ's discussion of Dr. Chambers' examination of plaintiff on February 11, 2011 is similarly problematic. The ALJ stated:

> On February 11, 2011, the claimant reported no giveaway weakness of his knees with only a little instability at times. Examination revealed tenderness over the tibial tubercle with primary tibial tubercle consistent with old Osgood-Schlatter's syndrome. The claimant had moderate to mildly severe patellofemoral crepitus, mild tenderness, and no instability. His knee alignment was normal. The claimant had some prepatellar swelling with intact sensation and motor strength. X-rays revealed minimal joint space narrowing with some patellofemoral degenerative changes, left more than right. The claimant had evidence of an old Osgood Schlatter's with ossicles in the tibial tubercle and shallow trochles [sic]. Alignment appeared normal. The claimant was diagnosed with left knee tubercle enthesitis and patellofemoral degenerative joint disease. Knee replacement was not recommended. The claimant underwent knee injection and was started on Pennsaid drops for his knee condition.

R. 24. While the ALJ's summary of the X-ray results and Dr. Chambers' findings upon examination are accurate (R. 461-62), her characterization of Dr. Chambers' conclusion– "[k]nee replacement was not recommended"–is misleading. Dr. Chambers actually stated: "At his weight and age, I think TKR [total knee replacement] would be a bad idea. *I think they will wear out too soon. He may be a candidate for PFR [patellofemoral replacement]. I would want to get an MRI before we consider that.*" R. 462 (emphasis added). Thus, in both of his reports, Dr. Chambers concluded only that total knee replacement was not a treatment option *at that time*, due to plaintiff's age and weight. By truncating Dr. Chambers' conclusions as she did, the ALJ made it appear that Dr. Chambers opined that plaintiff's knee condition was not severe enough to warrant surgical intervention. Dr. Chambers proffered no such opinion. In fact, Dr. Chambers specifically stated that a partial knee replacement (PFR) may be an option. Id.

Because the ALJ "cherry-picked" the evidence in this misleading fashion, it is impossible to confirm that her RFC determination is supported by substantial evidence. Accordingly, I conclude and respectfully recommend that this matter be remanded to the Commissioner for a determination of plaintiff's RFC encompassing fair consideration of Dr. Chambers' reports.

## VI.  CONCLUSION

For the reasons set forth above, I respectfully recommend that defendant's motion for judgment on the pleadings be **DENIED**, that plaintiff's motion for judgment on the pleadings be **GRANTED** and that the case be **REMANDED** for further administrative proceedings consistent with this Report & Recommendation pursuant to 42 U.S.C. § 405(g), sentence four.[22]

Dated:  February 23, 2015
     White Plains, New York

Respectfully submitted,

Paul E. Davison, U.S.M.J.

---

[22]  In the interest of providing guidance on remand, I note the following evidentiary errors in the ALJ's credibility assessment (which plaintiff did not raise as grounds for remand):

First, the ALJ stated: "While the claimant has stated that he was unable to work as a result of his medical condition, he *routinely reported* to his physicians that he was *'retired' from work.*"  R. 22 (emphasis added).  This statement unfairly and inaccurately reflects the record for two reasons: (1) plaintiff reported to Dr. Chambers that he was a "retired police officer" – he did *not* report that he was retired from *all* work, as the ALJ's comment implies (R. 372-73); and (2) based on a review of the record, plaintiff made no similar statement to any other doctor at any other time.

Second, the ALJ stated: "Despite the claimant's allegations of such significant pain and limitations, treatment notes also reveal that the claimant was not prescribed any prescription or narcotic pain medication."  R. 22.  Contrary to the ALJ's statement, the record clearly reflects that plaintiff was prescribed Flexeril for his back pain and Pennsaid drops and a corticosteroid injection for his knee pain.  R. 330-32, 462.

On remand, the ALJ's credibility assessment must be based upon fair consideration and accurate recitation of the record evidence.

-32-

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections.  See also Fed. R. Civ. P. 6(a).   Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Kenneth M. Karas, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.